UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

        Plaintiff,

                              File No.  1:09-CR-57

v.

                              HON. ROBERT HOLMES BELL

SCOTT TUCKER,

        Defendant.

_____/


## OPINION

On February 25, 2009, a federal grand jury indicted Defendant on four counts of

violating the National Emissions Standards for Hazardous Pollutants ("NESHAP"), which

govern the handling and disposal of asbestos ("the asbestos regulations"), and three counts

of violating the Toxic Substances Control Act, which governs the handling and disposal of

polychlorinated biphenyls.  (Dkt. No. 1.)  This matter is before the Court on Defendant's

motion to dismiss Counts I-IV of the indictment, the counts that allege violations of the

asbestos regulations.  (Dkt. No. 46.)  For the reasons that follow, this motion will be denied.

### I. Factual Background

Defendant Scott Tucker is the president and owner of H & M Demolition.  In January

of 2005, H & M Demolition was hired to demolish a kiln-drying building at VKW

Hardwoods in Wyoming, Michigan (the "VKW site").  At all times Defendant was aware that

the roof of the kiln-drying building was made up of transite, a cement-like material that

contains asbestos. After examining the building, Defendant concluded that, due to the instability of the roof panels, it would not be safe to remove the panels by hand prior to demolishing the building. He therefore decided to use a hydraulic excavator to remove the roof panels, a process that would demolish the panels, or portions thereof, in the process. Defendant claims that he spoke on the telephone with a NESHAP inspector from the Michigan Department of Environmental Quality (MDEQ) about his intentions, and the inspector approved the plan. Defendant does not recall the name of the inspector with whom he allegedly spoke.

Defendant began demolishing the roof panels on January 26, 2005. On January 27, in response to a tip, inspector Langworthy, a representative from the Michigan Occupational Health and Safety Administration (MIOSHA), visited the work site and collected samples of the roof material. Langworthy submitted the samples to the Michigan Department of Labor and Growth for testing and notified MDEQ of possible NESHAP violations. On February 1, 2005, after receiving confirmation that the samples collected by Langworthy tested positive for asbestos, three MDEQ inspectors visited the VKW site where they notified H & M employees that the roof contained asbestos and must be disposed of accordingly. The three inspectors also collected seven additional debris samples. On February 2, Jaline Tucker, Defendant's wife and co-owner of H & M Demolition, instructed employees to remove all the asbestos-containing material from the work-site and dispose of it in a cement-recycling yard. The yard was not an approved asbestos disposal facility. According to the

government, Defendant affirmed his wife's instruction. On February 5, 2005, one DEQ inspector returned to the work site and collected two additional material samples. Government agents collected twelve samples in all.

The government charges Defendant with four counts of violating the asbestos regulations in the course of the VKW project. The government asserts that Defendant: (1) knowingly failed to carefully lower all regulated asbestos-containing material to the ground prior to demolition in violation of 40 C.F.R. § 61.145(c)(6)(ii); (2) knowingly failed to adequately wet the transite debris and to ensure that it remained wet until disposal in violation 40 C.F.R. § 61.145(c)(6)(i); (3) knowingly caused the discharge of visible emissions to the outside air during the transportation of asbestos-containing material in violation of 40 C.F.R. § 61.150(a); (4) knowingly failed to deposit all asbestos-containing material at an asbestos disposal site in violation of 40 C.F.R. § 61.150(b).

Defendant's motion raises four issues: (1) whether Counts I-IV should be dismissed because all of the samples of the transite roof taken from the VKW site have been destroyed or lost; (2) whether Counts I-V should be dismissed because the government cannot prove that the combined amount of regulated asbestos-containing material at the VKW site was at least 160 square feet; (3) whether Counts I-IV should be dismissed because the asbestos regulations are unconstitutionally vague; and (4) whether Count I should be dismissed under the doctrine of entrapment by estoppel.

## II. Law and Analysis

*1. Loss of the Samples*

All twelve material samples taken from the VKW worksite were lost or destroyed before Defendant was given the opportunity to examine, test, or photograph them. Defendant first argues that the government cannot establish its prima facie case without the samples. However, the government was able to test the samples, and it expects to introduce the test results and photographs of the samples during trial in support of the charges. No legal rule prevents the government from introducing photographs and test results of samples solely because the samples themselves are no longer available. *See California v. Trombetta*, 467 U.S. 479, 488-89 (1984) (permitting the use of breathalyser test results when the breath samples themselves had been destroyed); *United States v. $28,980 in U.S. Currency*, 786 F. Supp. 899, 905 (D. Or. 1990) (permitting the use of results of a drug "sniff test" performed on currency when the currency was no longer available for defendant to test).

Although the absence of the samples themselves does not preclude the introduction of tests results and photographs of the samples, the charges must be dismissed if the unavailability of the samples would violate Defendant's Fifth Amendment right to due process. *See* U.S. Const. amend. V; *Arizona v. Youngblood*, 488 U.S. 51 (1988). If the discarded samples could have contributed to the suspect's defense, and if the suspect is deprived of this potential contribution due to the unavailability of the samples, the loss or destruction of the samples may violate Defendant's due process rights. *See Trombetta*, 467

U.S. at 488 ("Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense.")

Depending on the extent to which the discarded evidence could have contributed to the suspect's defense, one of two tests applies to determine whether the government's failure to preserve evidence results in the denial of the defendant's due process rights. *Youngblood*, 488 U.S. at 57-58; *Illinois v. Fisher*, 540 U.S. 544, 547-49 (2004); *Moldowan v. City of Warren*, 578 F.3d 351, 384-89 (6th Cir. 2009); *United States v. Turner*, 287 F. App'x 426, 431-32 (6th Cir. 2008) (unpublished); *United States v. Wright*, 260 F.3d 568, 570 (6th Cir. 2001). If the destroyed evidence had a "material exculpatory" value, i.e., an "exculpatory value that was apparent before the evidence was destroyed," its loss or destruction denies a defendant due process as long as the defendant is "unable to obtain comparable evidence by other reasonably available means." *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988); *California v. Trombetta*, 467 U.S. 479, 488-89 (1984). Evidence has "material exculpatory" value if it is "clearly exculpatory." *United States v. Burston*, 608 F. Supp. 2d 828, 833 (E.D. Mich. 2008). However, if the evidence would have been merely "potentially useful" to the defendant, a due process violation results only if the government destroyed the evidence in bad faith. *Youngblood*, 488 U.S. at 58. Evidence is "potentially useful" to a defendant if it is "of conceivable evidentiary significance," *id.* at 58, or if it "might conceivably have contributed to [the suspect's] defense." *Trombetta*, 467 U.S. at 489. Thus, to determine

whether Defendant's due process rights would be violated by the unavailability of the roof samples, the Court must first determine whether the samples would have been "material[ly] exculpatory" or "potentially useful" to Defendant.

Two threshold requirements relating to the characteristics of the asbestos-containing material must be satisfied for the asbestos regulations to apply. First, the regulations only cover material that contains over 1% asbestos. 40 C.F.R. § 61.141 (definition of RACM). Second, the regulations only apply to material that is friable, meaning it can be crumbled, pulverized, or reduced to powder by hand pressure when dry, or that, if not friable, "has a high probability of becoming or has become crumbled, pulverized, or reduced to powder by the forces expected to act on the material in the course of demolition."[1] *Id.*; *see also* 40 C.F.R. Pt. 61, Subpt. M, App'x A (defining regulated asbestos-containing material as ordinarily non-friable material that contains over 1% asbestos and "has already been or is likely to become crumbled, pulverized, or reduced to powder"). The government has the burden of proving these requirements. The asbestos samples could have either been "material[ly] exculpatory" or "potentially useful" to Defendant to rebut the government's evidence of both requirements.[2]

---

[1]The regulations also apply to certain types of non-friable material "that will be or [have] been subjected to sanding, grinding, cutting, or abrading." 40 C.F.R. § 61.141.

[2]Defendant also seems to assert that, because a sample must be "representative" of the asbestos-containing material as a whole, Defendant needs access to the samples to determine if they are actually representative. However, whether a sample is representative is a determination that can be, and often is, made without reliance on the samples themselves. If the Court was

(continued...)

A. One Percent Asbestos Content

As probative of whether the asbestos content of the transite was not over 1%, the samples would have been merely "potentially useful" to Defendant. According to the government, its tests revealed that each sample contained 15% asbestos. There is no indication that the government's tests were not reliable, suggesting that the chances are extremely low that any tests conducted by Defendant would have revealed an asbestos content of 1% or lower, a significant departure from the government's results. *See Trombetta*, 467 U.S. at 489 n.10 (noting that the reliability of the government's test results is an important factor in determining the exculpatory value of destroyed evidence). However, even if there was a possibility that Defendant's tests of the asbestos samples would have revealed a content at or below the 1% threshold, "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant" is merely "potentially useful" evidence, not evidence of clear and material exculpatory value. *Youngblood*, 488 U.S. at 57.

B. "Crumbled, Pulverized, or Reduced to Powder"

Likewise, as probative of whether the transite roof was either friable or had "a high

---

[2](...continued)

required to compare the characteristics of a sample to the characteristics of the material as a whole to determine if the sample was representative, there would be no need for the sample because the Court could simply rely on the characteristics of the material as a whole to determine the asbestos content and friability of the material. Also, Defendant's challenge to the representativeness of the samples is fully addressed and dismissed in this Court's opinion on Defendant's October 2, 2009, motion in limine. (Dkt. No. 52.)

probability of becoming or [did] become crumbled, pulverized, or reduced to powder by the forces expected to act on the material in the course of demolition," the samples would have been merely "potentially useful" to Defendant. The parties agree that undisturbed transite is ordinarily a non-friable material. Thus, the applicability of the asbestos regulations depends on whether the transite roof panels had "a high probability of becoming or [did] become crumbled, pulverized, or reduced to powder by the forces expected to act on the material in the course of demolition." 40 C.F.R. § 61.141.

Defendant argues that, if the samples were available, the jurors would have been able to "hold, touch and feel these pieces of material (and the other samples) so that they can appreciate how hard, heavy, strong, non-crumbly and rigid the material is." (Dkt. No. 47, Def.'s Br. 12-13.) According Defendant, allowing the jurors first-hand access to the samples would compel a conclusion that the transite roof did not become crumbled, pulverized, or reduced to powder during the demolition, and in this sense the samples had a "clear" and "material" exculpatory value.

This argument is unavailing for two reasons. First, it is not clear to the Court that, had the jurors been permitted to observe the samples first-hand, they would have concluded that the transite roof as a whole had not "become crumbled, pulverized, or reduced to powder" during demolition. Defendant is correct to assert that the jury *might have* made this determination, but the fact that the jury might have made this determination makes the samples "potentially useful" to Defendant, not materially exculpatory. The jury might have

also concluded that, even if the samples themselves were relatively large chucks of solid, cement-like material, the irregularities of the samples indicated that the transite roof was badly damaged during destruction, and that the roof as a whole had "become crumbled, pulverized, or reduced to powder" as a result.

Second, in meeting the threshold requirement, the government is not limited to convincing the jury that the transite roof panels actually became "crumbled, pulverized, or reduced to powder," by forces that did "act on the material in the course of demolition." Though this is one way to satisfy the threshold requirement, the regulations also apply if the transite roof panels had "a high probability of becoming . . . crumbled, pulverized, or reduced to powder by the forces expected to act on the material in the course of demolition." 40 C.F.R. § 61.141. As indicated by the use of the phrases "high probability of becoming" and "expected to act," this is a determination that must be made before demolition actually begins. In other words, even if, during and after demolition, material does not become crumbled, pulverized, or reduced to powder, the regulations would still apply if, prior to the start of demolition, it was determined that there was a high probability that the material would become crumbled, pulverized, or reduced to powder during demolition.

The Court acknowledges that this interpretation may result in the application of the asbestos regulations to demolition projects that would not, in fact, run great risk of emitting asbestos fibers into the air, and in this sense the regulations may be over-inclusive. For example, under 40 C.F.R. § 61.145(c)(6)(i), demolition companies must wet regulated

asbestos-containing material after removing it from a structure.  It may seem strange to requiring the wetting of material that, though expected to crumble, did not crumble.  But given the difficulty in identifying when dangerous fibers have actually escaped, it is entirely possible that the EPA intended that the regulations apply broadly.  Regardless of the reason, the regulations clearly apply not only to material that has crumbled by virtue of the demolition process, but also to material that is expected to crumble by virtue of the demolition process, whether it crumbles or not.

The samples themselves could not have been "materially exculpatory" to Defendant on the issue of whether, as determined prior to demolition, the transite roof had a "high probability" of becoming crumbled, pulverized, or reduced to powder during demolition because the samples alone would not have been determinative of this issue.  The samples themselves could only be determinative of whether the roof had actually become crumbled, pulverized, or reduced to powder after demolition.  Other evidence would be needed to determine whether the way the roof did react to demolition was the way it was expected to act.  Probative of the way the roof was expected to act are the EPA's determinations, of which Defendant was aware, that "[i]n a demolition, cementatious [sic] [asbestos-containing material] cannot remain in a structure, as it is likely to become regulated in the demolition/handling process," and that such material "must be removed prior to demolition." (Dkt. No. 47, Def.'s Br. Ex. 2 Notification of Intent to Renovate/Demolish (emphases in original).)  In addition, the EPA has published its opinion that "[a]ny demolition operation

10

. . . will extensively damage Category II ACM [such as transite] such that it is crumbled, pulverized or reduced to powder." Memorandum from John B. Rasnic, Director, Statutory Source Compliance Division, to James J. Burke (Jan. 8, 1992), available at http://cfpub.epa.gov/adi/.  In light of this additional evidence, even if it was clear that the jury, with first hand access to the samples, would have concluded that the transite roof had not become crumbled, pulverized or reduced to powder during demolition, it would still be possible for the jury to conclude that the roof was expected, based on a high probability as assessed prior to the start of demolition, to become crumbled, pulverized or reduced to powder during demolition.  For this reason, the samples themselves would have merely been "potentially useful" to Defendant.

C. Bad Faith

Because the samples would have merely been "potentially useful" to Defendant to rebut the government's evidence that the asbestos content of the transite was over 1% and that the transite had a "a high probability of becoming or [did] become crumbled, pulverized, or reduced to powder by the forces expected to act on the material in the course of demolition," Defendant must prove that the government lost or destroyed the samples in bad faith.  *Youngblood*, 488 U.S. at 58.  Though the government may have been negligent in destroying the samples, there is no evidence of bad faith.  *See United States v. Branch*, 537 F.3d 582, 590 (6th Cir. 2008) ("Negligence, even gross negligence, on the part of the government does not constitute bad faith.").  Rather, the samples appear to have been

destroyed pursuant to laboratory policy. *See United States v. Smith*, 534 F.3d 1211, 1224 (10th Cir. 2008) ("Generally, destroying evidence according to an established government procedure 'precludes a finding of bad faith absent other compelling evidence.'" (quoting *United States v. Beckstead*, 500 F.3d 1154, 1159 (10th Cir. 2007)); *United States v. Jobson*, 102 F.3d 214, 218 (6th Cir. 1996) (finding no bad faith because the evidence was destroyed as a matter of routine police department policy).

D. Spoliation

Even though the destruction of the samples did not violate Defendant's due process rights, the Court believes that a rebuttable spoliation instruction is appropriate in this case. The Court appreciates Defendant's argument that the physical characteristics of the asbestos-containing material play a uniquely significant role in NESHAP prosecutions, given the focus of the asbestos regulations on the tendency of asbestos-containing material to crumble when crushed by hand or by demolition activities. The government should have implemented procedures to preserve the samples, and it was negligent in failing to do so. *See* E.P.A., Guidelines for Asbestos NESHAP Demolition and Renovation Inspection Procedures 6-1 (1990) (instructing inspectors that "samples should not be destroyed; they should be stored in a locked facility pending future litigation.").

District courts possess broad discretion to impose spoliation sanctions that "serve both fairness and punitive functions." *Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009). Due to the unique emphasis of the asbestos regulations on the physical characteristics of the

asbestos-containing material and the government's negligence in failing to preserve the samples, Defendant is entitled to a spoliation instruction that permits, though does not require, the jurors to infer that the samples would have been detrimental to the government's ability to prove that the 1% asbestos content and friability requirements were satisfied. However, the government is permitted to present all admissible evidence to rebut this inference.

*2. 160 Square-Feet Requirement*

In addition to applying only to asbestos-containing material that has at least a 1% asbestos content and that is friable or, if not friable, "has a high probability of becoming or has become crumbled, pulverized, or reduced to powder by the forces expected to act on the material in the course of demolition," the asbestos regulations only apply if "the combined amount of [regulated asbestos-containing material] is . . . at least 15 square meters (160 square feet)" ("the 160 square-feet requirement"). 40 C.F.R. § 61.145(a)(1)(i). Defendant argues that Counts I-IV should be dismissed because the government cannot prove that the kiln-drying building contained a combined amount of regulated asbestos-containing material that was at least 160 square feet. Defendant bases his argument on EPA Interpretive Rule 1.A.2, which provides that if transite roofing materials "are removed without 160 ft² or more of such roofing material being crumbled, pulverized [or] reduced to powder, the operation is not subject to the [asbestos regulations] even where the total area of the roofing material to be removed exceeds 160 ft²." 40 C.F.R. Pt. 61, Subpt. M, App'x A § 1.A.2 [hereinafter

Rule 1.A.2]. According to Defendant, this rule only permits "crumbs and powder" to count toward the 160 square-feet requirement, and the government cannot show that, when demolition of the kiln-drying building was complete, there were 160 square-feet of crumbs and powder of asbestos-containing material remaining.

Defendant's argument is unavailing. To the extent possible, the pronouncement interpreting the regulations should be read consistently with the regulations themselves, and if there is a conflict between the two, the regulations should prevail. *See, e.g.*, *Stinson v. United States*, 508 U.S. 36, 36-37 (1993); *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945) (noting that administrative interpretations of regulations are given controlling weight unless they are clearly erroneous or inconsistent with the regulation). Rule 1.A.2 is an interpretation of 40 C.F.R. § 61.145(a), which states the requirement that, in a demolition project, the regulations only apply "if the combined amount of [regulated asbestos-containing material] is . . . at least 15 square meters (160 square feet)." The interpretation of this requirement thus depends on the definition of "regulated asbestos-containing material," which is found in 40 C.F.R. § 61.141. In fact, Rule 1.A.2 acknowledges that, because the definition of "regulated asbestos-containing material" is incorporated into 40 C.F.R. § 61.145(a), Rule 1.A.2 is an interpretation of both the 160 square-feet requirement and the definition of "regulated asbestos-containing material." *See* Rule 1.A.2 (citing the definition of regulated asbestos-containing material). Included in the definition of "regulated asbestos-containing material" is material that contains over 1%

asbestos and that, though ordinarily not friable, "has a high probability of becoming . . . crumbled, pulverized, or reduced to powder by the forces expected to act on the material in the course of demolition." Reading 40 C.F.R. § 61.145(a) in conjunction with the definition of asbestos-containing material, the regulations apply to a facility being demolished "if the combined amount of [material that contains over 1% asbestos and that, though ordinarily not friable, 'has a high probability of becoming . . . crumbled, pulverized or reduced to powder by the forces expected to act on the material in the course of demolition'] is . . . at least 15 square meters (160 square feet)." Thus, the regulations themselves require that the determination of whether the 160 square foot requirement is met be made *before* demolition actually begins through a measurement of the asbestos-containing material that is highly likely to crumble by virtue of the forces that are expected to act on it during a subsequent demolition.

To the extent Rule 1.A.2 requires that demolition be complete before it can be determined whether the 160 square-feet requirement is met, the rule is inconsistent with the regulations, and the regulations themselves control. However, the Court doubts that Rule 1.A.2 commands a post-demolition assessment of whether the 160 square-feet requirement is satisfied. First, Defendant's interpretation of Rule 1.A.2 would make the determination of whether the regulations apply unduly burdensome. The interested party would need to wade through the asbestos-laden wreckage, pick out all the pieces larger in size than a crumb, arrange the remaining powder into some measurable formation, and then make the

15

determination as to whether the powder adds up to 160 square feet. A more feasible interpretation of the rule requires the parties to measure the material that is likely to crumble if demolished while that material is still intact and reasonably capable of measurement. Second, a pre-demolition assessment of whether the 160 square-feet requirement is met is the only way to ensure that demolition companies comply with 40 C.F.R. §§ 61.145(c)(1), (c)(2)(ii), and (c)(6)(ii), which require that all regulated asbestos-containing material be carefully removed before demolition begins. If the satisfaction of the 160 square-feet requirement, and thus the application of the asbestos regulations, could only be determined after demolition was complete, as Defendant's interpretation of Rule 1.A.2 would suggest, companies would have no way of knowing whether they should carefully lower the asbestos-containing material to the ground before beginning demolition. Finally, Rule 1.A.2 itself implies the appropriateness of a pre-demolition assessment of the satisfaction of the 160 square-feet requirement by instructing demolition companies to look to the likelihood that the *removal methods* will cause 160 square feet of asbestos-containing material to become crumbled, pulverized, or reduced to powder. *See* Rule 1.A.2 ("For [asbestos-containing roofing material], if the area of the roofing material to be removed is at least 160 ft$^2$ and the removal methods will crumble, pulverize [or] reduce to powder . . . 160 ft$^2$ or more of such roofing material, the removal is subject to the NESHAP.").

For the foregoing reasons, the Court holds that the determination of whether the 160 square-feet requirement is met must be made before demolition begins through a

measurement of the asbestos-containing material that has a "high probability" of crumbling by virtue of the forces that are expected to act on it during a subsequent demolition. Demolition companies first must determine whether the suspect material contains over 1% asbestos. They then must determine if the method expected to be used to remove that material creates a "high probability" that the material will become crumbled, pulverized, or reduced to powder. If these two requirements are satisfied, and if the removal method that is likely to result in pulverization will be used to remove 160 square feet or more of the material, the regulations apply.

The roof of the kiln-drying building contained approximately 49,000 square feet of asbestos-containing transite. As Defendant's Notification of Intent to Renovate/Demolish indicates, Defendant intended to use, and did use, a hydraulic excavator to remove all 49,000 square feet. If the jury determines that the transite roof had a "high probability" of becoming crumbled, pulverized or reduced to powder when removed by the hydraulic excavator, the regulations apply to the removal of the roof.

*3. Vagueness Doctrine*

The asbestos regulations only apply to material that is ordinarily not friable if the material has a "high probability of becoming, or has become, crumbled, pulverized, or reduced to powder during the course of demolition." 40 C.F.R. § 61.141. Defendant argues that the asbestos regulations are void for vagueness because the phrases "high probability" and "crumbled, pulverzied, or reduced to powder," do not give demolition companies fair

warning as to whether and when the regulations apply.

In general, to avoid being held void for vagueness, a law must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). However, if the challenged law, "involves conduct of a select group of persons having specialized knowledge" a court should consider that specialized knowledge in determining whether a law is vague. *United States v. Weitzenhoff*, 35 F.3d 1275, 1289 (9th Cir. 1994). Additionally, regulations governing business activity are:

> subject to a less strict vagueness test because [their] subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry . . . .

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982). "Vagueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988). Also, in determining whether a law is void for vagueness, "every reasonable construction must be resorted to, in order to save a [the law] from unconstitutionality." *United States v. Caseer*, 399 F.3d 828, 839 (6th Cir. 2005).

As applied to Defendant, the phrase "high probability" is not unconstitutionally vague. As a business-owner with an economic interest in regulatory compliance, Defendant was free to request a determination from the EPA as to whether the transite roof panels had a

"high probability" of crumbling during demolition. But even in the absence of such a request, on several different occasions the EPA has explicitly clarified that the demolition of cementitious material such as transite does create a "high probability" that the material will crumble, and that such material is covered by the asbestos regulations. (Dkt. No. 47, Def.'s Mot. Ex. 2 Defendant's EPA Notice of Intent to Demolish); *see also* 54 Fed. Reg. 912-01 (Jan. 10, 1989). Because the EPA has stated that transite has a "high probability" of crumbling, Defendant had "a reasonable opportunity to know" whether his conduct was prohibited.

Similarly, as applied to Defendant, the phrase "crumbled, pulverized, or reduced to powder," is not unconstitutionally vague. First, the EPA used three different descriptive words to convey the idea; it is hard to imagine how the EPA could have been more clear. Additionally, during the November 1, 2009, oral argument on Defendant's motion to dismiss, in relation to Defendant's argument that the 160 square-feet requirement was not satisfied, counsel for Defendant informed the Court that he can easily recognize crumbs and powder when he sees them. The Court is confident that Defendant too, as the owner of a demolition company, knows what it means for material to be pulverized or reduced to crumbs and powder.

*4. Entrapment by Estoppel*

Defendant also seeks to dismiss Count I of the indictment by arguing entrapment by estoppel. Count I alleges that Defendant failed to carefully lower all asbestos-containing

material to the ground before demolishing the kiln-drying building in violation of 40 C.F.R. § 61.145(c)(6)(ii). According to Defendant, a MDEQ representative gave Defendant permission to remove the transite roof panels using a hydraulic excavator in the course of demolition. Defendant argues that, under the doctrine of entrapment by estoppel, the government may not now hold Defendant criminally liable for doing something he was given express permission to do.

The Sixth Circuit has endorsed the defense of entrapment by estoppel. *See United States v. Levin*, 973 F. 2d 463 (6th Cir. 1992). To establish the defense, Defendant must show that: (1) a government agent announced that the charged criminal act was legal; (2) Defendant relied on the announcement; (3) Defendant's reliance was reasonable; (4) given Defendant's reliance, the prosecution would be unfair. *Levin*, 973 F. 2d at 468.

Although this defense is available to Defendant, it is not a proper grounds on which to base a motion to dismiss because "generally, the identified standards involve factual determinations." *Levin*, 973 F.2d at 468. In this case, the parties dispute whether Defendant ever received authorization to remove the roof panels with an excavator. Additionally, there is a question of fact as to whether Defendant relied on the announcement, and as to whether his reliance was reasonable in light of the fact that the person with which Defendant allegedly spoke did not observe the kiln-drying structure first hand before approving Defendant's plan. A jury is needed to answer these factual questions. *United States v. Schaffer*, No. 09-3053, 2009 WL 3763157, at *10 (6th Cir. Nov. 12, 2009) ("[W]ell

established precedent makes clear that the question of entrapment is generally one for the jury, rather than for the court. In related areas, courts discourage the pre-trial disposition of motions to dismiss that are based on defenses requiring fact finding.") (citations omitted).

### III. Conclusion

The government's destruction of the asbestos samples taken from the VKW site did not violate Defendant's due process rights because the samples were not of "material exculpatory" value to Defendant and the government did not destroy the samples in bad faith. However, in light of the unique emphasis of the asbestos regulations on the physical characteristics of the asbestos-containing material and the government's negligence in destroying the samples, Defendant is entitled to a rebuttable spoliation instruction as indicated herein. Defendant is not entitled to have the asbestos regulations charges dismissed on the grounds that the 160 square-feet requirement is not satisfied because the requirement will be satisfied if the jury decides that the transite roof, which was 49,000 square feet, had a "high probability of becoming crumbled, pulverized or reduced to powder" when removed with a hydraulic excavator. The asbestos regulations are not void for vagueness because, as the owner of a demolition company, Defendant has been given a reasonable opportunity to know what is prohibited. Finally, while Defendant is entitled to raise the defense of entrapment by estoppel, whether the elements of the defense are satisfied is a question for the jury. An order consistent with this opinion will be entered.


Dated: December 9, 2009                          /s/ Robert Holmes Bell
                                                 ROBERT HOLMES BELL
                                                 UNITED STATES DISTRICT JUDGE